Good morning, Your Honors. May it please the Court, Christy Hughes, on behalf of Mr. Wallace. I'd like to reserve four minutes for rebuttal. So I know there's a lot of issues raised in this case, and I want to address three here, unless the Court has questions about the others. So I'd like to focus on the lack of probable cause for the search warrant, the misleading ballistics testimony, and the jury's special finding on the sentencing allegation of the Brown murder. Your voice drops off quite a bit. Oh, I apologize. So what was number three? The jury's special finding on the sentencing allegation. I'm going to grab a water bottle. So in terms of the search warrant, we argue there was no probable cause to support the search warrant for the firearm, but there was at most reasonable suspicion for the officers to briefly investigate whether this was an illegal assault weapon. And that's because in California, it's not necessarily illegal to have an assault weapon, and you can't tell just by looking, especially through the window of a van in the dark, whether something is necessarily illegal. But the police officer said he could see a flash of a search warrant. He did. There was no explanation of how he knew that. If you look at the warrant, it's just... I saw it. I guess there's no description of the flash suppressor. There's no explanation of his... He says, I've been an LAPD officer for 20 years, but there's no description of training, how many assault rifles or flash suppressors he's seen. There's nothing of that. But I think our other point that we raised is you can't tell by looking whether this gun is registered. You also can't tell whether it has a detachable or a fixed magazine. So those two, because it can be converted, and the officer can't see that. And so the officer essentially assumed that it was unregistered, assumed that it hadn't been converted, and manufactured a probable cause that way, when at most he had, again, reasonable suspicion to briefly investigate whether this was registered. We've analogized to the cases where officers believe that a driver is unlicensed or a car is unregistered, and in those circumstances, the officers have reasonable suspicion for a brief investigatory search to determine the licensing status, but not probable cause for a full search. He put it in his affidavit, didn't he, that it looked like an assault weapon? He does, and then he basically just cut and paste the statutory definition of that. But there's not sort of a bare-bones explanation of why he believes or what he saw. But you can't tell whether the magazine is detachable or not or things like that, unless you really look at it, can you? I mean, get it, pull it out, see. Correct. And so he made those assumptions, and that's why we're arguing, you know, he assumed it was unregistered. He assumed this was fixed. He just says, I observed in plain view, or the other officers told him they observed in plain view in the storage area behind the seat through the rear window, an assault weapon. And then he says, I observed the assault weapon. It appeared to be a semi-automatic center fire rifle with a detachable magazine, a pistol grip, and a flash suppressor. That's literally just a cut and paste from the California statute that outlines the features test for an assault weapon. But there's no descriptions of any of that. It's really just, I don't know, I'm assuming this is an illegal assault weapon. I'm assuming it's been unregistered. And so I want to go and dig around in the car, but that gives him reasonable suspicion for a brief investigatory search, not probable cause to search the entire car. Counsel. Yes. I can answer your question. I've always understood from reading Supreme Court cases that a major touchstone of the Fourth Amendment is reasonableness. And so when we look at what the probable cause, we should have a reasonable interpretation of that. So my question is this. The officer says he saw the rifle. He says he saw some features that would indicate it was an assault weapon. So why isn't it reasonable for the officer to get a search warrant so they could take a closer look at the rifle? Well, I think if he needs a closer look at the rifle to verify, which is what he said, he wanted the search warrant to verify that it was an assault weapon, that's just a brief investigatory search rather than probable cause to search the entire car. So I think that's the distinction. And, again, California has sort of these specific ways that an assault rifle can be legal. They are not necessarily illegal in California, and it could have been registered. It could have been purchased before this certain time and registered before a certain year. And instead of him searching to determine the registration status or briefly getting the gun to determine whether it was illegal, he assumed it was unregistered and, therefore, illegal. He assumed it had these features and, therefore, was illegal under the statute. He didn't say he assumed. He said he saw the features. He saw a flash suppressor, a detachable magazine, and a centerfire rifle. Those three features make it an assault weapon, not registrable. You're correct, Your Honor. He assumed that it was unregistered in terms of the detachable or fixed magazine. Of course he assumed it was unregistered. If he has three features which make it unregistered, he concludes, not assumes, that it's unregistered. Well, those are the features that make it an illegal assault rifle, but you can still have those features and have registered it before a certain date. There's this grandfather clause, and so he assumed that it was illegal. Or if he found, he concluded that it was illegal by assuming that it was unregistered, which is something that you can't see through the back of the van. That's something that you have to briefly investigate. You can't see a date of registration of a gun, but through the back of the van. Correct. Unless you see the registration date of the gun, then it's an illegal search. Correct. For the full search, I think, unless you know the registration status, you can. . . You keep referring to the full search. What other evidence was unearthed by the search of the automobile? Mr. Wallace had his rental car agreement with his name on it in there. They searched for prints. This was how they sort of connected the gun up to Mr. Wallace was they found identifying information in the car. I don't know if there were water bottles that they tried to get DNA evidence off of, but it was mainly that they had his rental car agreement with his name on it, and then they got the fingerprints. I'll turn to the ballistics testimony regarding Daniel Rubin.  Judges are supposed to be on the alert for the potential that that testimony could be misleading to the jury about how reliable and how accurate ballistics testimony is. And so judges have to put up these safeguards to ensure that the expert only testifies to a reasonable degree of ballistics certainty. And that comes from this court's case in Johnson. And the judge here was aware of this. There was a pretty extensive pretrial discussion after the defense filed an eliminate motion, and the judge said that testifying that this was the same gun implied too much certainty. And that's why he ruled that Daniel Rubin couldn't testify to that. The judge said it gave him heartburn for Rubin to say this was the same gun. Too much certainty, the most that Rubin could say was the bullet's characteristics matched, but not the ultimate conclusion that this was the same gun. And then, of course, at trial, Rubin testified twice that this was the same firearm, that the bullets came from the same source, but he hadn't found any other gun that these bullets could come from. And that, testifying that they were the same firearm, just doesn't leave room for the jury to doubt or question this evidence. In the court's prior cases of Johnson and Cazares, there was room left for the jury to sort of doubt the ultimate conclusion. Both of those experts had testified that this was a subjective conclusion that they were making, that this was not to a scientific certainty, and so that was why the court found that that testimony was either admissible or was harmless. Here, there wasn't that. He just reached, he made this sort of certain conclusion that this is the same firearm, and there's no room for doubt. Was there an objection made at that time as to his testimony? There was not. There was an objection made later when Detective Hernandez sort of picked up on it and kept referring to it as the same gun in the murder weapon. Is there an applying error? No, Your Honor. So the government has argued that, but if you look at the Archdale and the Louis cases, this was addressed in an eliminate motion. The district court definitively addressed it, ruled on it, and said this comes in. And so it was a clear ruling. We didn't have to take an exception to that ruling later at trial. I want to talk about the harmlessness of this or the prejudicial impact of Rubin's testimony. This court said in Vera that scientific experts have the imprimatur of validity, and I think the government is discounting how the jury would have observed Rubin's testimony. He was an expert that the court clarified certified as an expert. He said he had been an expert for over 31 years. He testified over 250 times. So this was the sort of irrefutable evidence that the government put forth that the gun was linked to Mr. Wallace. The other evidence was the cooperating witness testimony that was heavily in dispute, and I think it's pretty clear that the jury disregarded it, given that they acquitted on the Pickett special sentencing allegation but found Mr. Wallace guilty of the Brown murder. So the difference between those two was this gun, that Rubin testified was the firearm used there. The government has also argued that Mr. Wallace admitted in jail calls and in interrogations that this was the Brown murder weapon. That's not the case. He said, and this is at 6 ER 1222 to 1225, in 2016 he told Agent Kane that another gang member had told him that this AK-47 was good for a hot one, meaning it had been used in a murder. Nothing was said that it was the Brown murder. He said again in a 2016 jail call, 6 ER 1217, that this was when he was in custody on an earlier weapons charge. He was saying, oh, they're trying to charge me with the little K that was found in the rental van. They're saying there's a homicide on it. Again, nothing about the Brown murder. The only, I think, evidence that came in talking about this AK-47 being used to kill Red was at 6 ER 1168. That's during a 2020 interrogation. But when the officer says, well, how do you know that? He says, oh, the prosecutor and my attorney told me this, or I heard it on the streets. That's not an admission that he knows that this gun was used to kill Reginald Brown. I think that's a statement from him that he's been told that from other people, but he's not conceding that's necessarily true. Is it an adoptive admission? I don't think so, Your Honor. I mean, I think he clearly, especially when the government played this. He didn't say they were wrong. He just said he accepts it. I don't know that he accepts it. I think he's explaining where he heard that from, so it's not necessarily that it's true, but I understand Your Honor's point. I think under vacant envelopments, hearsay, was there a specific objection to the evidence? When those videos were played, Your Honor? No, the government admitted those were statements by Mr. Brown in terms of him conveying hearsay. In those interrogation statements, I'd have to go back and check. I don't believe there was an objection to hearsay, but I can double-check and let you know on rebuttal. If there's a hearsay objection or if there's not a hearsay objection, I thought the law was that I'm objected to a hearsay. It's fully admissible for all purposes. Is Your Honor thinking back to Judge Bea's point about the adoptive admission? Yeah, I think that's related. I thought there's just a different doctrine that you can't challenge a hearsay statement based on hearsay if it wasn't objected to. So there was a video. Council, government council, was that? You watched the video, right? No, that was in Council below. Okay. Well, some council was there. Yes. And did they object to the hearsay statement? I don't believe so, but I can double-check and let you know on rebuttal, Your Honor. Thank you. Our last argument was the jury's finding about the special sentencing allegation for the Brown murder. And so there in the project, and this is at 1 ER 66, the jury found that Ms. Sabralos willfully, deliberately, with premeditation, and malice aforethought, murdered Reginald Brown. So that is the definition of first-degree murder. There's the premeditation. There's the deliberation. And there's nothing in that finding about the elements of any conspiracy liability. There's no overt acts. There's no agreement. Nothing. And the problem is there wasn't evidence of any principal liability or of first-degree murder presented at trial. All of the evidence, all of the argument at trial, was that he was guilty of conspiring to kill Brown. And this, I think, is clear from the government's closing argument at 10 ER 2110. The government said, You know that Reginald Brown was murdered. There is no question. And this is first-degree murder. Again, there is no question. Those men were murdered in cold blood. Reginald Brown, Fabina Hoover. Conspiracy to commit murder. And then they go on and talk about conspiracy law. They then talked about conspiracy at 10 ER 2114, 10 ER 2204. So there was just simply no evidence, no legal theory, no jury instruction that would have allowed the jury to make this special sentencing finding that he was guilty as a principal. A murder is a murder, correct? Yes, Your Honor. The gun was, there was some evidence the gun belonged to Wallace. Why wouldn't that be sufficient evidence that he gave the gun to the gunman to kill Brown? Well, the problem is the jury wasn't instructed on aiding and abetting liability for this count, for this question. They were instructed on aiding and abetting liability for the 924 charge but not count 1. And so, again, there was no basis for the jury to find aiding and abetting liability for this count. Did defense counsel object to that procedure? To the verdict form? Yes. They did not, Your Honor. They went along with it, right? Correct. We've argued this under a sufficiency challenge, and they did make a Rule 29 at the close of the evidence, however. I'll reserve the remainder of my time unless the court has further questions. Thank you. Thank you very much. Good morning. I accuse the court, Alexander Robbins, on behalf of the United States. Unless the court wants me to start somewhere else, I'd like to start with the expert issue and just address. Why don't you address the issues that Ms. Yu brought up? Yes, sir. And that was her number two issue. But take them in order then. I'll start with her primary issue on appeal, which is the warrant issue. I think the notion that police officers did something wrong by obtaining a warrant for a rifle, which appeared to be an assault rifle, in plain view, in the back of a car, unsecured, in the middle of the night, outside of a gang fight, is somewhat far-fetched. Even if the rifle had not been an assault rifle, it would have been improperly, illegally stored in the car under California law. And the rifle had obvious, visible characteristics of an assault rifle under California law, such as a pistol grip and a flash suppressor. A registered assault rifle cannot be carried in a California car. Is that the idea? It has to be unloaded, Your Honor. And this one had a visibly detachable magazine inserted into the rifle, which at the very least raises a probable cause that it's loaded. You normally don't put a magazine into a rifle unless it's loaded. Although, again, this is a probable cause standard, not more likely than not. I think the Westby case that we cite is right on point here. Police officers are not required to negate all possible innocent explanations for something in order to meet the probable cause standard. People who appear to be having a party in an unoccupied house in the middle of the night, that's a probable cause that they're trespassing. Even if there might be innocent explanations, maybe they were allowed to be there. But police officers don't have to assume or, I guess, negate all innocent explanations for conduct. Bless you, Judge O'Sullivan. The notion here is, on a number of grounds, the defense argument fails, but I think the most common sense one is the defense admits that they weren't required to just leave the gun there in the middle of the night, apparently loaded in the back of a van. What the police did here was really they took the more conservative, more careful route of getting a state judge to issue a warrant rather than just breaking into the car to retrieve the gun and further investigate, as the defense puts it, in the middle of the night. The state judge issued this warrant at 2.30 a.m. The police took the more conservative course that courts on the Supreme Court want them to take. Even when they would have been justified breaking into the car to take a look at the rifle to determine that, in fact, it was an assault rifle under California law and that it wasn't registered once they could read the serial number and run it through the database. There's certainly no requirement and there's no authority for the proposition that police are required to determine that an assault rifle under California law, an assault rifle as defined by California law, is unregistered before investigating it, before getting a warrant for it. It authorizes the search of the car besides the grasping of the rifle. It certainly authorizes the search of the car to the, again, particularity requirement, and this is, I should clarify no one thing, that this issue of probable cause was not raised below and we think under Guerrero it's barred. It's a new theory of suppression. The particularity issue was raised below and certainly the warrant was valid as to seizing the gun to investigate whether it was, in fact, an unregistered assault rifle and second to determining evidence of ownership of the gun, which would include the rental papers in the car. The defense raises some issue about drugs or other evidence that was mentioned in the warrant affidavit, which is not an issue here and even if that were a problem it would be separable in any event, but the only issues that we care about here are the gun itself and the papers in the van. They'd need to have the papers in the van to see if that's the owner of the weapon, I suppose. I think, I mean, we have not raised an affirmative inevitable discovery argument here. I don't think it's necessary, certainly under Leon, good faith standard, but there are other ways of finding out who owns a rental van. The van itself has a license plate on the outside. That's going to be a matter of public or readily available record that the police could figure out. It might take a little longer to do it. I'm sorry. It might take a little longer to go through that. It might take a little longer, but it was information that was there and available to them, but it's not necessary to make an inevitable discovery finding in a case like this. The police, I think the defense admits here and on page 8 of their reply brief, if I understand my colleague correctly, that the police were justified in investigating the gun, which would have required them to go into the car physically to touch the gun or at least get close enough to look at the serial number. And here they took the more conservative step of actually getting a warrant in the middle of the night for it, which is what we want police to do. That was entirely appropriate and amply supported by probable cause. The cases that my colleague relies on about guns not being presumptively illegal, which is true. Guns are not presumptively illegal in this country. We have a Second Amendment. Those are cases from open carry states where the court said, yes, in a jurisdiction where it's presumptively legal to openly carry a firearm, it's not probable. You don't have probable cause when you see someone doing that to stop and investigate them. Putting aside the constitutional issues, which, again, wouldn't matter under the Supreme Court's decision in High End versus North Carolina, that's entirely a field from what we have here. Because here we have something that not only is a particular type of weapon as defined under state law, but on top of that had a detachable magazine that appeared to be loaded, that in fact was loaded, it was 13 rounds, it was longer than a fixed magazine would have been allowed in any event. It was in the back of the car in the middle of the night. But I think police would have had the authority to get a warrant for the car regardless. Certainly would have had the authority to enter the car to investigate the gun that was improperly stored regardless. Did the defendant, now appellant, raise the proven case at all? No, Your Honor. And again, it would not have mattered under High End. The Supreme Court's decision in High End says that a constitutional challenge doesn't defeat the probable cause standard. That's H-E-I-E-N. It said it in our brief. So even if it turns out that California's special treatment of assault, of what's defined as assault weapons under California law, was completely and utterly unconstitutional, it wouldn't affect the probable cause determination in this case. And also, just as a side note, the notion that you can't tell whether something is a detached magazine or a fixed magazine by looking at it is something, I'm just an assistant United States Attorney, but knowing something about guns, that seems completely wrong. You can tell a flash suppressor when you see it. You know what a detachable magazine looks like. Certainly a police officer would know what a detachable magazine looks like. And the notion that you can superglue a detachable magazine to a gun, I don't know how you would load it then, and magically transform it into something that wouldn't fit California's definition, doesn't really make any sense. And in any event, would not defeat probable cause. The court has no questions on this issue. I'll turn to the expert issue. Tell us about the expert. About the expert. My colleague focused on the ballistics expert, Ruben, so I'll start there. The notion that it violates Cazares to state no degree of certainty at all, I think is just wrong and inconsistent with the opinion. What Cazares says, what this court said at Cazares, is that an expert cannot, so if you use phrasing or words that imply a greater special scientific certainty, that's more than a normal certainty. I think a reasonable degree of scientific certainty was the phrase in, actually no, scientific certainty was the phrase in Cazares. And the department's policy since then, which the defense cites in their brief, the OLP, Office of Legal Policy website that they cite in their brief, is to certainly avoid those terms, a reasonable degree of scientific certainty, scientific certainty, avoid that entirely. And the policy that the defense cited is, in fact, to not use any of those terms at all, which is allowed by Cazares. Cazares says if you're going to use a phrase like scientific certainty, don't do that. You can say a reasonable degree of certainty. That's at the end of Cazares. It approves of that. And so that would be allowable under this court's case law. What the expert here did is used no certainty language whatsoever. Just give his opinion, which is exactly what the rule on expert testimony allows. And, I think importantly, gave the basis for his opinion. This wasn't a situation where the expert came in and just said, you know, I'm an expert. I know everything about guns. And I looked at the bullets that were fired. The exemplar shell casings, and I looked at the bullets from shell casings, sorry, from the scene, and they match. Now, if you take a look at the testimony, it's 860 through 885. It's only 25 pages. Volume 5 of the expert's record, 860 to 885. The expert, Rubin, marches through with the jury exactly what he did and goes through his notes that were part of the report to describe to the jury how he matched up the marks on the shell casings that were the exemplars with the shell casings that were recovered from the crime scene. In the same way that a handwriting expert might go through and talk about the loops on someone's F and the way they do their B, the way they write certain letters. Or a fingerprint expert will show pictures of fingerprints and talk about how visually you match them up. In fact, jurors want to hear that, and jurors don't want to just have an opinion thrown at them with nothing else. But by giving the basis for what he did, the expert is necessarily explaining how he did what he did and the sort of inherent subjectivity, to the extent that there's subjectivity in any scientific analysis. The expert is describing that subjectivity. The expert is describing what he did in his process of visually matching up the different marks. He goes through the different parts of the gun that would make different marks. He talks about the action, the bolt, the mark that the bolt, the shell casing makes when it's ejected. He talks about all these different things and gives examples to the jury. He laid out, he showed his work, in other words. That, I think, more than anything else, belies the notion that the expert was just saying, I have some sort of magic ability to know the truth through science, and leaving it, the jury, with some mistaken impression that science is inherently certain. Which is obviously not true. He used that phrase, scientific certainty, though. Did not. He did not. The claim, and that's why I think this case doesn't match Kazar's at all. The problem in Kazar's was the expert used the phrase, scientific certainty. The expert here did not use the phrase, scientific certainty. What the defense is claiming here is that by not using any phrase at all, that somehow violates Kazar's. And there is no support for that in this court's case law, I think in logic and common sense, but also not in any authority that the government is aware of in other related contexts, as we point out in our brief. This is an issue that comes up when you're matching art. You're evaluating art. Experts do that. When you're doing handwriting matching. When you're doing fingerprint matching. There's no authority for the proposition that somehow violates the rules of evidence to not use the phrase, reasonable degree of certainty, versus just offering the opinion. That doesn't make any sense. If the defense were right about this, there would be a legion of case law about magic words that experts had to say in order for their opinion to be dialogued with their matching handwriting or matching art pieces or fingerprints. That's simply not the case here. I believe that the defendant is making the objection that the trial court failed to make a finding that the expert's methodology was correct. And we concede under Holdeen, which was decided six months after this trial, that under Holdeen, express findings were required, and that's why we concede that that was an error under Holdeen. The case we point out in our 20-page letter, recently decided, Jimenez-Chernez is, I guess, the most recent published case analyzing homelessness or lack of prejudice under the plain error standard on Holdeen error, I'll call it, lack of express findings. And Jimenez-Chernez explains that there are two ways, there's sort of two steps, two ways that a Holdeen error might be harmless. One is if the expert opinion itself was reliable, then the lack of express findings are harmless. Or, even if they're not, if the testimony would not have affected the outcome. The defendant has to show a quote, that's in the end of Jimenez-Chernez, and I think it makes sense logically. In one case, the first step is, should the evidence have come in? And the second step is, if the evidence came in erroneously, would it have affected the outcome? Jimenez-Chernez says that at the end of the opinion, and I think pretty clearly. And then, I guess the third step is, even if there were a reversible, potentially reversible error under the bacon case that we cite, the en banc case, the correct remedy would be a remand to allow the district court, in the first instance, to make findings, if necessary. But we don't think it's necessary here, because the defense hasn't met either of the two steps that it would need to, to show prejudicial error. Because this was perfectly reliable testimony, and the record bears that out. He described exactly what he did in matching up these bullets, shell casings, sorry, in matching up the shell casings that he recovered from the scene, with the examples that he test fired. And to the extent that there was a problem with that, or there was some potential mistake, or a lack of thoroughness, the defense could have brought that in cross-examination. Just as an example, the expert said he didn't match every single shell casing from the scene of the crime with every single exemplar shell casing that he test fired. Because that would take an unreasonable amount of time. The defense could have cross-examined him on that. Mr. Robbins, I think you should dedicate some time to the jury's findings. I'd be happy to do that. The special finding, I think, as we put in our brief, is just based on this reading of the verdict form. I direct the court to pages 66 and 67 of the first volume of the expert's record. It lays out the form itself. The form does not specify principal liability, or aiding and abetting liability, or Pinkerton liability. It just asks the jury to determine whether the defendant murdered either of the two decedents, which is either Pickett or Brown. The jury decided that he did murder Brown. That was the finding. The case law, or federal law, and California law, is that aiding and abetting liability and Pinkerton liability are just different theories of liability. They're not separate crimes that would need to be listed separately in a verdict form. There's nothing wrong with a verdict form. A verdict form is correct on its face. And, in fact, the jury did find that the defendant murdered Rachel Brown. But there was no instruction on aiding and abetting, correct? There was instruction on aiding and abetting and Pinkerton as to count two, which actually came right after the discussion of this part of a verdict form in count one. So the jury was instructed on the principles of Pinkerton liability and aiding and abetting. It's at 2052 to 2054 of Volume 9 of the excerpt. And it was referred to by the government in closing. So I think one of my colleagues said something about the government's closing argument. I understand the government can't instruct the jury on the law in closing argument. The jury has to follow the court's instructions. But the government in closing argument referred to Pinkerton co-conspirator liability and aiding and abetting liability generally and said the defendant doesn't need to be the one who pulled the trigger, as the court instructed you. And it didn't limit that to count two. There was no attempt by the defense to sort of make some distinction between the theories of liability on count one versus count two. Everybody understood that you could be guilty of murder even if you didn't pull the trigger, which was correct legally and the court instructed the jury on it. And that counsel didn't make an objection to this form of the verdict? No. I think this was an agreed-upon verdict form of recollection service. Certainly there was no objection to this piece of it that they're complaining about now. And as my colleague said, procedurally their approach to dealing with that lack of objection is to make this a sufficiency argument rather than an instructional error argument. But procedurally that dooms them because even if there were an error under Masacchio, the Supreme Court's decision in Masacchio, sufficiency isn't affected by overly narrow or heightened instructions. So even if the verdict form had said you find him guilty as a principal because he pulled the trigger of murdering Reginald Brown, if it even had said that, the evidence would still be sufficient to support guilt on murder under Rico because he was guilty under, because the defense admits the evidence was sufficient under a Pinkerton co-conspirator liability theory. Because Masacchio says that you evaluate sufficiency against the evidence and the correct law, not erroneously heightened or narrowed law. Thank you very much. I think your time is finished. Once the Court has any questions. Thank you. Ms. Hughes. Roboto. Thank you, Your Honor. Judge Gould, I double-checked. There was no hearsay objection when the government played that video about Mr. Wallace's interrogation. In terms of the warrant, the government brought up that this is waived under Guerrero, and I just want to address that quickly. Guerrero, the Guerrero panel noted that Rule 12 no longer requires a finding of waiver, doesn't say waiver anymore about the amendment. Three other circuits apply the plenary standard, which the Guerrero panel said is more familiar and more workable standard. But this Court, on April 1st, decided Zappellasan, that's an inventory search case. And what the Court did there is they asked the defendant to brief a theory of suppression that was not raised below. And the Court addressed that, dismissed it ultimately. But the dissent and the concurrence know that this should have been waived under Guerrero. And the panel said, no, we're going to address it. It wasn't even raised in the opening brief, and the Court still considered that theory. And what the dissent notes is the defendant there raised a Fourth Amendment claim below in district court, and so he now can raise a different theory of suppression on appeal, and that's what we've done. And I'm happy to 28-J that for the Court, if Your Honors would like. In terms of Daniel Rubin's testimony about the firearm, so he didn't say scientific certainty. That's correct. But I think, and as Your Honor noted, Judge Baez sort of dovetails with the lack of a reliability finding. He did explain his methods. The problem is because the judge never made an explicit reliability finding, never addressed whether ballistics testimony is reliable or sort of one of those subjective forensic analysis that we're now learning are actually not as accurate as we've been led to believe in the past. The judge never went through any of that. He just said, oh, I'll leave it up to the jury to determine if they agree with his conclusions. But ballistics testimony is different. That's what this Court said in Cazares and Johnson. The judge has to be alert that this is not misleading, and when the judge doesn't make the reliability finding up front to actually look at the science, and the jury is presented with this, then it doesn't really have the capacity to understand. It listens to its ultimate conclusion, which is same firearm, same source. Did the defense counsel ask for a special instruction at that point? During the trial, Your Honor? Yes, when the district court let the witness testify about it, and defense counsel, I guess, said, well, I wish you would instruct about the significance of a witness' expertise on firearms. No, because they had filed an eliminate motion on this saying we don't think he's reliable. They had submitted the PCAST report saying ballistics testimony has an actually substantial likelihood of being inaccurate. They lost on that, but they still could have asked for instruction, right? They could have. I mean, that would have required them, I think, to take exception to the district court's ruling to formulate a specific instruction about Daniel Rubin. So Your Honor is correct. They did not. One last point on this jury special finding. The aiding and abetting instruction went to count two. It never informed the jury that they could find aiding and abetting as to count one, and that, I think, is important for the court to take into account. I see I'm out of time, so unless Your Honor has further questions. Thank you very much, Ms. Hughes. Thank you, Your Honor. No further arguments. With that, the case of the United States of America v. Paul Gary Wallace will be submitted, and that brings us to the end of the calendar and the end of the week. So we are now in adjournment. All rise. Gary, Gary, all persons having had business before this court or before the United States Court of Appeals for the Ninth Circuit shall now depart from this court for this session and is adjourned.
judges: Siler, GOULD, BEA